MARTIN, Appellant, et al.,

v.

OHIO STATE UNIVERSITY FOUNDATION; Great–
West Life Assurance Company et al., Appellees.

[Cite as *Martin v. Ohio State Univ. Found.* (2000), 139 Ohio App.3d 89.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–1248.

Decided Oct. 17, 2000.

90

92

*Shayne & Greenwald Co., L.P.A., Gary D. Greenwald, Andrew P. Wecker* and *Daniel K. Friend,* for appellant.

*Chorpenning, Good & Mancuso, Elliott R. Good* and *Van R. Shirey,* for appellee Great–West Life Assurance Company.

*David L. Day, L.P.A.,* and *David L. Day,* for appellee Dennis Clark and Associates Agency, Inc. and William D. Clark.

*Ray & Alton* and *John M. Alton,* for appellee William D. Clark.

---

BROWN, Judge.

Raymond A. Martin, plaintiff-appellant, appeals the October 19, 1999 judgment of the Franklin County Court of Common Pleas journalizing the trial court's directed verdict in favor of William Clark, Dennis Clark and Associates Agency, Inc., and Great–West Life Assurance Company, defendants-appellees.

In 1956, appellant and his wife, Margaret, who died of a heart attack during the pendency of this case, acquired 3.84 acres of property on Sawmill Road, in Columbus, Ohio. At that time, the property around Sawmill Road was rural farmland. In 1985, the property was rezoned for commercial development, and the property value and real estate taxes increased dramatically. Beginning in 1985, the Martins attempted to sell the property. Although they received monthly option payments of $5,000 from a developer for two years, they could not sell the property.

In approximately August 1989, William Clark spoke with the Martins' son, Ron, and learned that appellant and Margaret wished to sell the Sawmill property to raise money for their retirement. In 1989, appellant was sixty-five-years-old and Margaret was fifty-nine-years-old. As an agent for Great–West, Clark sold insurance and also performed financial and estate planning. Ron gave Clark permission to call appellant. Clark and appellant spoke and, thereafter, met numerous times from August through December 1989. From the first meeting, appellant explained that he wished to sell the Sawmill property and buy retirement property in Florida or Arizona. Clark told appellant that he could transfer the property into a charitable remainder unitrust ("CRUT"), which would produce an income stream to the Martins. Clark also told appellant that he could use part of the income from the CRUT to purchase an insurance policy that would pay $1,000,000 to the Martins' children upon both of their deaths.

To aid in developing a financial plan for the Martins, Clark introduced appellant to Willis Wolfe, who introduced himself as a lawyer and financial planner. Wolfe was proficient with the financial planning software Pro Plan. Using a questionnaire completed by the Martins, Wolfe and Clark used the Pro Plan software to develop recommendations for the Martins.

Appellant and Clark decided that the Ohio State University ("OSU") Foundation would be the trustee of the CRUT, and in December 1989, appellant and Clark met with Michael Fellows, the director of trusts and estates for OSU. There was conflicting testimony at trial as to whether Fellows ever told appellant that after conveying the property into the CRUT, there would be no payment of retirement income to the Martins until OSU sold the property in the trust. Appellant testified that at no time was he ever told that his income stream would not begin until the sale of the property by the trustee.

Also during early 1990, the Martins continued to discuss the insurance policy portion of the financial plan. After deciding that the premiums for insuring appellant would be prohibitively high, due to health factors, they decided to insure Margaret using "vanishing premiums" on a $1,000,000 policy. The vanishing premiums plan called for the Martins to pay large annual premiums that would cease after five years.

In February 1990, Clark and Wolfe gave appellant a preliminary draft of a "Cash Flow Analysis," detailing a possible plan involving the CRUT and insurance recommendations. The document reflected that the Martins would receive $45,000 in payments from the CRUT in 1990, $95,000 in 1991, and increasing amounts thereafter. The analysis also showed that purchasing the Florida property and paying the insurance premiums would cost the Martins $27,500 in 1990, and $55,000 thereafter. In March 1990, Clark and Wolfe gave appellant another Cash Flow Analysis, indicating that the Martins would receive income from the CRUT of $48,000 in 1990, $97,000 in 1991, and increasing thereafter. The second analysis again showed that the Martins would be able to pay the Florida mortgage and insurance premiums with the income generated from the CRUT.

In the spring of 1990, Fellows gave a brochure to the Martins entitled "Charitable Remainder Unitrusts" and a videotape. Appellant testified that he believed the brochure reinforced what Clark had explained: The CRUT would produce monthly income for him based on the property value in the trust, starting in the first year. Appellant met several times with Fellows in the first half of 1990, culminating in a meeting in May 1990, at which the Martins and OSU settled on $1,262,500 as the fair market value of the Sawmill property.

In April 1990, while appellant continued to discuss the CRUT plan with Fellows, Clark met with Edward Hertenstein, an estate attorney, and thereafter

directed Hertenstein to prepare a CRUT agreement. Appellant never spoke with Hertenstein at any time before the closing of the CRUT.

In May and June 1990, appellant entered into negotiations with OSU regarding the fixed percentage of net asset value that OSU would pay to the Martins pursuant to the CRUT. Although Clark and Wolfe had originally used eight percent in making their calculations, OSU stated that seven percent was more realistic. Appellant testified that Clark, who attended the negotiations, told him to move down to seven percent, indicating that appreciation in the trust value would make up the difference. Appellant also testified that at no time did Clark indicate that the percentage was not guaranteed.

In June 1990, at the request of Clark, Fellows faxed to Wolfe a copy of the internal solicitation memorandum for the CRUT. On the last page of the memorandum, Fellows had written that no payments would be made from the trust until after the sale. However, appellant testified that he did not see a copy of the fax until he filed suit, and Fellows testified that he did not send the copy to appellant.

In July 1990, Clark and Wolfe gave the Martins a document entitled "Estate Planning Ideas for Raymond and Margaret Martin." One option discussed in the document was for the Martins to sell the property themselves and receive $48,160 annually for twenty-four years, at the end of which they would have zero dollars. The other option was the Clark/Wolfe recommendation of using the CRUT/Insurance Plan, which would yield $96,000 per year, beginning in 1990, and increase at a rate of three percent per year for life. The CRUT/Insurance Plan also showed that it would cost $39,810 annually for five years for the vanishing premium insurance policy, after which the premium payments would cease.

Clark and Wolfe prepared a memorandum for the Martins detailing this financial plan. Clark first faxed the memorandum to Fellows for his opinion. Next to Item 4 on the document, which stated that payments from the CRUT would begin the first year, Fellows noted that this could not be done because there was no income from the property yet. Fellows testified that he could not remember if he faxed back the copy, but he did believe that he spoke with Clark over the phone regarding his comments. Thereafter, Clark redrafted the document, fully deleting Item 4. When the document was delivered to the Martins, there was no discussion regarding no payments starting until the property was sold. Clark and Wolfe also delivered a document entitled "A Retirement and Tax Planning Summary for Raymond and Margaret Martin." This document also showed that if the Martins chose the CRUT/Insurance Plan, the option would pay the Martins $21,000 in 1990, $84,630 in 1991, and increasing thereafter.

Although an initial insurance policy was issued for Margaret in late spring and early summer, that insurance policy was issued before appellant had accepted the

Clark/Wolfe plan, so it was cancelled. Another policy was issued after the August 16, 1990 closing of the CRUT. The insurance policy was based on an annual premium of $45,144.36, payable in monthly installments for five years.

The CRUT agreement was executed on August 16, 1990. Due to laws regarding gifts of property encumbered by liens to CRUTs, the Martins sold a one-fifth interest in the property to the OSU Foundation for $225,000, part of which was used to pay off the mortgage on the property, and placed the remaining four-fifths interest in the CRUT. Appellant testified that he did not see the CRUT agreement until the date of closing. Although Clark and Wolfe accompanied appellant to the closing, they did not explain the terms of the CRUT to him at that time. Believing that the CRUT called for payments to begin immediately upon execution, the Martins made payments on several items at this time, including their Florida property and the insurance premium.

After the Martins did not receive any payment from the CRUT for the quarter following its execution, they contacted OSU and Clark, who told them that the payments would not begin until the property was sold by the trust. The property did not sell until October 1992. Because they did not have any money to pay the large premiums on their insurance policy, they stopped paying the premiums. Clark advanced the Martins' premium payments for six months. The Martins then requested that the coverage be reduced to $250,000. Clark executed a promissory note and mortgage from the Martins as collateral for the advances on the premiums. However, the Martins were still unable to pay the premiums and allowed the policy to lapse. The Martins received their first trust payment in January 1993, although they never received more than five percent per year up to the time of trial.

On July 19, 1994, the Martins filed a complaint naming as defendants the OSU Foundation, the treasurer of the OSU Foundation, William Clark, Dennis Clark and Associates, Inc., and Great–West Life Assurance Company. The complaint was dismissed and then refiled. The complaint stated claims for fraud, negligent misrepresentation, breach of contract, and breach of fiduciary duty.

On October 13, 1998, Great–West filed two motions for summary judgment, which were denied. In December 1998, the Martins settled with the OSU Foundation and its treasurer for $675,000. A trial was commenced on September 21, 1999, as to the remaining defendants. Appellees moved for directed verdict at the close of the Martins' case. On October 19, 1999, the trial court filed its judgment entry granting appellees' motion for directed verdict, and the Martins appealed to this court. Margaret died of a heart attack on November 16, 1999, and we granted appellant's motion for leave to substitute him as the only appellant. Appellant appeals the judgment of the trial court, asserting the following assignments of error:

"1. The trial judge committed reversible error by granting a directed verdict in favor of defendants on the plaintiffs' claims of fraud and negligent misrepresentation.

"2. Regarding expert testimony of Robert Jaffe on insurance and financial planning:

"a. The trial judge committed reversible error by prohibiting Mr. Jaffe from testifying on those matters that were the subject of his voir dire examination and his proffered testimony.

"b. In excluding Mr. Jaffe's testimony under Evid.R. 702, the trial court was improperly influenced by its erroneous conclusions that Mr. Jaffe's 1986 deferred adjudication under Texas law, which resulted in a probation and fine and subsequent termination without a finding of guilt in November 1988:

"i. Constituted a conviction for purposes of Evid.R. 609(A);

"ii. Fell within the 10–year time limit prescribed by Evid.R. 609(B); and

"iii. Did not constitute inadmissible evidence of an expungement-like procedure under Evid.R. 609(C).

"3. The trial judge abused his discretion by refusing to allow Bruce Niswander to provide testimony on plaintiffs' damages arising from the sale of life insurance to the plaintiffs as part of a financial plan.

"4. The trial judge committed reversible error by encouraging defense counsel to object to the questioning of Tim Martin and Raymond Martin as to certain nonhearsay statements attributable to Great–West and otherwise berating plaintiffs' counsel.

"5. The trial judge abused his discretion by allowing the defense counsel to cross-examine plaintiff Raymond Martin regarding rental income from his sons."

 Appellant argues in his first assignment of error that the trial court erred in granting a directed verdict in favor of appellees on his claims of fraud and negligent misrepresentation. Because the trial court's decision focused on the representations by Clark and Wolfe regarding the start date of the trust payments to appellant, our decision will also focus on this issue. When reviewing a trial court's ruling on a motion for directed verdict, the reviewing court must construe the evidence most strongly in favor of the nonmovant and determine whether "upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." *Wagner v. Midwestern Indemn. Co.* (1998), 83 Ohio St.3d 287, 294, 699 N.E.2d 507, 513. A motion for a directed verdict tests whether the evidence presented is legally sufficient to take the case to the jury. *Id.,* citing *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255, reversed

on other grounds (1999), 85 Ohio St.3d 457, 709 N.E.2d 162; *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 116, 430 N.E.2d 935, 937–938. In deciding the motion, the trial court must not weigh the evidence or determine the credibility of witnesses. *Id.;* see, also, *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469. The motion for directed verdict must be denied "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions." *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 33, 697 N.E.2d 610, 618, citing *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 244, 363 N.E.2d 367, 368.

█ Fraud is defined as (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868. In order to establish a claim of fraud, it is necessary for the party to prove all of the above elements.

█ Additionally, a claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct. *Hancock v. Longo* (Oct. 14, 1999), Franklin App. No. 98AP–1518, unreported, 1999 WL 816148. "Representations concerning what will occur in the future are considered to be predictions and not fraudulent misrepresentations." *Assoc. for Responsible Dev. v. Fieldstone L.P.* (Nov. 13, 1998), Montgomery App. No. 16994, unreported, 1998 WL 785330. The exception to this rule is when the person "who makes his promise of future action, occurrence, or conduct, and who *at the time he makes it,* has no intention of keeping his promise. In such case, the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent." (Emphasis *sic.*) *Tibbs v. Natl. Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 287, 6 O.O.3d 300, 303, 369 N.E.2d 1218, 1223.

█ The first element of fraud is a representation or concealment of a fact. We find that construing the evidence most strongly in appellant's favor, there was sufficient evidence of a representation and concealment of fact to preclude directed verdict on the issue. Clark and Wolfe made numerous representations to the Martins that interest payments from the CRUT would be paid in the first year of the CRUT formation. In February 1990, Clark and Wolfe gave the Martins a preliminary draft of a "Cash Flow Analysis," detailing a possible plan involving the CRUT and insurance recommendation. The document reflected

that the Martins would receive $45,000 in payments from the CRUT in 1990, $95,000 in 1991, and increasing amounts thereafter. In March 1990, Clark and Wolfe gave the Martins another Cash Flow Analysis, indicating that the Martins would receive income from the CRUT of $48,000 in 1990, $97,000 in 1991, and increasing amounts thereafter. In July 1990, Clark and Wolfe gave the Martins a document entitled "Estate Planning Ideas for Raymond and Margaret Martin." It indicated that the Clark/Wolfe option would yield $96,000 per year beginning in 1990, and increase at the rate of three percent per year for life. Also in July 1990, Clark and Wolfe delivered a document entitled "A Retirement and Tax Planning Summary for Raymond and Margaret Martin." This document also showed that if the Martins chose the CRUT/Insurance Plan, the option would pay the Martins $21,000 in 1990, $84,630 in 1991, and increasing amounts thereafter.

Not only did Clark and Wolfe make these direct representations, but they also made omissions that would have otherwise informed the Martins that they would not receive any payments until portions of the trust property were sold. In the June 1990 internal solicitation memorandum, Fellows had written that no payments would be disbursed from the trust until after the sale of the property. However, appellant testified that Clark and Wolfe never showed him this document. In addition, on the July 1990 Clark/Wolfe memorandum, Fellows handwrote next to Item 4 that the Martins would receive no income in 1990 because there was no income from the property yet. In response, Clark redrafted the document, fully deleting Item 4. Appellant testified that Clark never informed him about the deletion of this paragraph or that the payments would not start until the property was sold. Therefore, construing this evidence most strongly in favor of appellant, we find that the first element of fraud was satisfied.

█ The second element for fraud is that the representation was material to the transaction at hand. There can be little argument that the representation by Wolfe and Clark that the payments would start immediately after the trust was formed was material to the transaction, insofar as the Martins were concerned. Clark and Wolfe were aware that appellant was seeking retirement income. They were also aware that appellant was relying upon the income to finance the purchase of property in Florida. Appellee Great–West even states in its brief that "[t]herefore, there is abundant testimony that at the time, Mr. Martin was grossly over-extended in his finances and required an immediate infusion of cash, from some source, in order to complete the purchase of the Florida home." In addition, just to be able to afford the large premium payments of approximately $40,000 per year for the Clark/Wolfe plan, appellant obviously needed immediate income to finance such a substantial annual outlay, given that in 1990, appellant was earning only $24,000 per year. In order to execute these transactions and

begin his financial plan, appellant clearly needed income immediately, and he testified that he planned to use the income from the trust to accomplish such. Further, all of the documents given to the Martins from Wolfe and Clark indicate their recognition that the Martins needed the income from the trust in 1990 to finance these pressing plans. Therefore, we find that the second element of fraud was satisfied because there was sufficient evidence presented that Clark and Wolfe's representation that the Martins would receive income in 1990 from the trust was material to the transaction being completed.

The third element of fraud is that the representation was made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred. The trial court found that Clark and Wolfe were only giving projections in the planning documents and did not make the representations with knowledge of their falsity. The trial court stated that it believed that Wolfe, Clark, and the OSU representatives were not aware of what one another were doing and that maybe there had been only a "misunderstanding." Likewise, appellees assert that the projections were mere predictions as to future events and were, thus, nonactionable expressions of opinion. We disagree.

The representation made in all of the documents given to the Martins by Clark and Wolfe was that the payments would start in 1990, immediately upon the formation of the trust. These were not "mere predictions" of future events. In all of the documents, Clark and Wolfe were making the affirmative representation that if appellant went with their CRUT/Insurance Plan, he would receive payments beginning upon the formation of the trust in 1990. Every calculation, analysis, and plan submitted by Wolfe and Clark showed payments starting in 1990. Despite the assertion that the projections were "mere predictions," the payment of interest beginning in 1990 was not contingent upon some unknown, hypothetical trust that had yet to be determined. Rather, Clark and Wolfe were making their numerical projections based upon the specific CRUT that appellant was negotiating with the OSU Foundation—the only type of trust that Clark and Wolfe had ever suggested to the Martins. Although the trial court described the situation as one in which each of the parties and trust representatives were acting independently, it appears that Clark and Wolfe were the persons directing the overall plan from the beginning and knew precisely the type of trust appellant was negotiating.

However, despite Clark and Wolfe's knowledge that the trust would not generate payments to the Martins until after the sale of trust assets, they continued to make the false statements that, if the Martins went with the CRUT, their payments would begin in 1990. They were informed on at least two occasions by Fellows that the CRUT could not begin in 1990; yet, they continued

to intentionally and falsely use 1990 as the starting date in their calculations and communications to the Martins. Although we agree that the dollar amounts, numbers, payout figures, and calculations utilized may be properly termed as "predictions," the starting date was not based upon an "opinion" or an "estimate." The starting date was presented as factual. Construing the evidence most strongly in favor of appellant, there was sufficient evidence that Clark and Wolfe continued to make these representations with full knowledge of their falsity. Thus, the third element of fraud was satisfied.

The fourth element of fraud is that the representation was made with the intent of misleading another into relying upon it. On this issue, the trial court did not make a specific finding but rather depended on the finding that appellant could not establish the other elements. We find that appellant presented sufficient evidence that, if believed by the jury, could support the finding that Clark and Wolfe made the representation with the intent of misleading him into relying on it. Appellant elicited testimony from Clark that he would receive a seventy-percent commission on his first-year insurance premium, which originally was to amount to approximately a $30,000 commission to Clark in the first year of the policy. Clark was also to receive three-to-five percent commissions on all premiums paid by appellant in the subsequent years. In addition, in an internal memorandum written by Fellows to the OSU treasurer, Fellows noted that Clark and Wolfe were "mercenary." Fellows testified at trial that by "mercenary" he meant that Clark and Wolfe stood to benefit financially by selling the insurance policy to appellant.

Further, the July 1990 "Estate Planning Ideas for Raymond and Margaret Martin" gave only two options to the Martins: the CRUT/Insurance Plan and the self-sale option. However, appellant testified that Wolfe and Clark told him that selling the property himself and not going with the CRUT/Insurance Plan was a "bad plan." We find that construing this evidence in favor of appellant, reasonable minds could have determined that Clark and Wolfe misled appellant as to the start date of the trust payments with the intent to induce him into following the plan that included the large insurance premium so that they could earn commissions. Therefore, this element of fraud has been satisfied.

The fifth element of fraud is that there was justifiable reliance upon the representation or concealment. The trial court found that appellant could not show justifiable reliance because he never read the trust document before signing it. The court also found that appellant had the duty to question Clark and Wolfe regarding the payment schedule because there had been so many different proposals.

With regard to appellant's duty to question Clark and Wolfe because they had produced so many different proposals, we find it difficult to agree with the trial court's interpretation. Although there had been numerous proposals presented to the Martins with varying figures, every proposal stated that the payments would begin in 1990. Because there was no conflict on this issue with any of the proposals, appellant would have had no reason to inquire on that subject.

With regard to appellant's duty to read the trust document before signing it, appellees are correct that, in general, a person may not claim to be misled into signing a contract when reading the contract would have revealed the conflict. See *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 662 N.E.2d 1074. However, appellant cites our case in *Mather v. State Farm Mut. Auto. Ins. Co.* (Oct. 4, 1984), Franklin App. No. 83AP–1112, unreported, 1984 WL 5929, in which we held:

"Although it is true that an insured cannot abandon all care in informing herself of the terms of her contract of insurance, where she was induced to enter into the contract by the misrepresentations of the insurer or its agent, the insured's duty to read is closely bound up with her right to rely. As the Supreme Court of South Carolina recognized, in *Thomas v. American Workmen* (1941), [197 S.C. 178], 14 S.E.2d 886, the duty to read will depend upon the facts of each case 'such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties.' *Thomas v. American Workmen, supra* [197 S.C. at 182, 14 S.E.2d ], at 888, and cases cited therein." (Citations omitted.)

Applying our holding in *Mather* to the facts of this case, we find that a reasonable juror could have found sufficient evidence that appellant's failure to read the trust document before signing it did not preclude his claim for fraud. We have already found that appellant relied upon representations regarding a material issue. In addition, Clark and Wolfe both had considerable experience in the insurance industry, and Clark testified that he had previous experience with CRUTs. Appellant, however, was not experienced in financial matters. In 1990, he was sixty-six years old and had never set up a trust before. Fellows noted in the internal memorandum to the OSU treasurer that "Mr. Martin needs our highest ethical consideration as he is not well educated in money matters and has chosen some rather middl[e] level advisors." Fellows testified that from his meetings with appellant, he recognized that appellant was not a sophisticated or knowledgeable person with respect to CRUTs. Appellant testified that nobody reviewed the terms of the CRUT with him before he signed it and that he did not feel he needed counsel because he "knew Mr. Clark had put together the personnel required to close, and I trusted their integrity and their knowledge. I

had no reason to question anyone." Construing this evidence most strongly in favor of appellant, a reasonable jury could find that appellant was justified in relying upon the representations of Clark and Wolfe, despite his failure to read the contract thoroughly.

We also note that appellees submitted evidence that appellant received the solicitation presentation memorandum prepared by Fellows indicating that no payment would be made from the trust until the property was sold, and evidence that appellant transmitted this memorandum to Harbor Federal Savings and Loan Association in order to secure financing for his Florida property. However, appellant testified that he never received this memorandum and that he never forwarded it to the loan association. Fellows testified that he never sent the memorandum to anybody but Wolfe. Thus, construing this evidence in appellant's favor, a jury could have found that he did not see this document before closing on the CRUT. Further, although Fellows also testified that he discussed with appellant the fact that the payments would not begin until the property was sold; this goes toward the weight of the evidence, not the sufficiency. Therefore, there was sufficient evidence that appellant could have justifiably relied upon Clark and Wolfe's representations. The fifth element of fraud is satisfied.

The sixth and final element of fraud is a resulting injury proximately caused by the reliance. Bruce Niswander, a certified financial analyst and attorney, testified on behalf of appellant. Niswander testified that the total damages through 1999, necessary to make the Martins whole, based upon Clark and Wolfe's representations, were $919,961.09. This amount represented that difference between the amount actually received by appellant and the amount represented by Clark and Wolfe in their financial plan, taking into account the $675,000 settlement by the OSU. Thus, appellant presented sufficient evidence to demonstrate that he suffered damages as a proximate result of his reliance upon Clark and Wolfe's representations. Therefore, construing the evidence most strongly in favor of appellant, we find that he presented sufficient evidence of all six elements of fraud, and the trial court erred in directing verdict in favor of appellees on that issue.

Appellant also argues under this assignment of error that the trial court erred in directing the verdict in favor of appellees on the negligent misrepresentation claim. The elements of negligent misrepresentation are (1) one who, in the course of his or her business, profession, or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; and (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. Cleve-*

*land Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837–838. A negligent misrepresentation claim does not lie for omissions: there must be an affirmative false statement. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269; *Zuber v. Ohio Dept. of Ins.* (1986), 34 Ohio App.3d 42, 45–46, 516 N.E.2d 244, 246–248. Further, " '[a] representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession.' " *Merrill v. William E. Ward Ins.* (1993), 87 Ohio App.3d 583, 590, 622 N.E.2d 743, 748, quoting Prosser & Keeton, Law of Torts (5 Ed.1984) 745, Section 107.

Thus, the elements of fraud and negligent misrepresentation are very similar, and much of the same evidence discussed above with regard to fraud also supports the elements of negligent misrepresentation. We find that reasonable minds, construing the evidence in favor of appellant, could reach different conclusions as to the issue of negligent misrepresentation. Therefore, appellant's first assignment of error is sustained, and we remand the matter for a new trial.

Appellant has also presented four further assignments of error. However, because these arguments address alleged evidentiary errors and prejudicial remarks made by the trial judge arising during the trial below, and we have remanded the matter for a new trial, these issues are moot. See App.R. 12(A)(1)(c). The matters may not come to pass upon retrial, and any ruling at this point would be merely advisory.

Accordingly, appellant's first assignment of error is sustained, his second, third, fourth, and fifth assignments of error are rendered moot, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for a new trial consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN, P.J., and McCORMAC, J., concur.

JOHN W. McCORMAC, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.