**CAPTIVA, INC., Plaintiff,**

v.

**VIZ COMMUNICATIONS, INC.,**
Defendant/Third–Party
Plaintiff–Appellant,

v.

**David Karzmer, Third–Party
Defendant–Appellee.**

No. 01–4084.

United States Court of Appeals,
Sixth Circuit.

Jan. 8, 2004.

Steven J. Miller, Deborah J. Michelson, Goodman, Weiss & Miller, Cleveland, OH, for Defendant–Appellant.

David A. Detec, Stephen T. Bolton, Thomas J. Lipka, Manchester, Bennett, Powers & Ullman, Youngstown, OH, for Third party–Appellee.

Before RYAN, MOORE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

Viz Communications, Inc. ("Viz"), defendant/third-party plaintiff/appellant, appeals the district court's grant of summary judgment in favor of David Karzmer, third-party defendant/appellee. Viz asserted a fraud claim against Karzmer, alleging that Karzmer, the President and CEO of plaintiff, Captiva, Inc. ("Captiva"), made false statements to induce Viz to enter into, and continue under, a distribution agreement with Captiva. Specifically, Viz alleged, *inter alia,* that Karzmer falsely stated that (1) Captiva intended to honor a "no return" policy, (2) Captiva intended to renew a letter of credit securing its obligations to Viz, and (3) Captiva intended to pay outstanding invoices.

The district court granted summary judgment in favor of Karzmer. It noted that, under Ohio law, a broken promise cannot serve as the basis of a fraud claim unless the promise was made without a present intention to perform. It concluded that Viz had failed to offer any evidence that Karzmer had no intention of performing when he allegedly made "promises"

concerning the "no return" policy, the letter of credit, and the payment of invoices.

Because Viz has not proffered sufficient evidence for a reasonable trier of fact to conclude that Karzmer made the alleged promises without any intention of honoring them, and because Viz has not supported the balance of its fraud claims with evidence of false representations, we affirm the judgment of the district court.

## BACKGROUND

This dispute arose from a distribution agreement between Viz and Captiva. Viz, a California corporation, publishes Japanese animation and comics—including *Pokemon, Dragon Ball Z,* and *Gundam Wing*—for English-speaking audiences in the United States. Captiva, an Ohio corporation, is a framing company that specializes in selling officially licensed merchandise. During the relevant time period, David Karzmer served as President and CEO of Captiva.

In the summer of 1999, Captiva approached Viz to propose an agreement whereby Captiva would distribute "multi-packs" of *Pokemon* comic books.[1] In June 1999, Karzmer telephoned Oliver Chin, Viz's Director of Sales & Marketing, to propose the arrangement. Soon thereafter, on or around June 28, 1999, Captiva sent Viz a "corporate profile," which detailed Captiva's current operations. Later, on or around July 1, 1999, Karzmer met with Chin, Seiji Horibuchi (Viz's President and CEO), and a Viz employee at Viz's San Francisco office to discuss Captiva's proposal.

During the negotiations, the discount rate emerged as a key issue. Normally, Viz sells its comics to its distributors at a 60% discount rate, meaning it charges the distributors 40% of the comic's cover price. Initially, Karzmer demanded a 90% discount rate. According to Karzmer, he requested a steep discount because, unlike other distributors, who simply resold the single issues supplied by Viz, Captiva would incur significant expenses in reformatting the single comics as "multi-packs," and because Captiva would be selling dated comics. According to Chin and Horibuchi, Karzmer justified his proposed discount on the grounds that Captiva would purchase a large volume of product, that Captiva would guarantee payment with a letter of credit, and that Captiva would not return product to Viz. Eventually, the parties agreed to a 72% discount rate.

At the July 1 meeting, the parties discussed Captiva's return policy. According to Chin and Horibuchi, Karzmer stated that Captiva did not accept returns from its current customers, and he promised that Captiva would not return any product to Viz. Karzmer agrees that he stated that Captiva did not accept returns from its current customers.[2] However, he denies making any promise not to return product to Viz, and he asserts that the parties did not discuss return policy under the proposed agreement.

On or around July 12, 1999, the parties entered into an agreement (the "Agreement") whereby Captiva received the exclusive right to distribute *Pokemon* comics in "multi-pack" format in the United States and Canada. The Agreement set a discount rate of 72%, and it obligated Cap-

---

1. A "multi-pack" is a set of four comic books repackaged as a single unit. The parties envisioned that Captiva would create "multi-packs" of old *Pokemon* comics and sell them to large retailers, such as Toys "R" Us, Wal-Mart, and K-Mart.

2. At this time, Captiva sold framed pictures licensed by, among other entities, NASCAR, the World Wrestling Federation, and the PBA Tour. As yet, Captiva did not sell comic books.

tiva to post an irrevocable letter of credit to secure its purchases. The Agreement did not expressly address the return of product from Captiva to Viz.

The parties commenced business immediately. On October 19, 1999, Captiva's initial letter of credit expired. According to Chin, around this time, he contacted Karzmer, who pledged to renew the letter of credit. Sometime later,[3] after Captiva failed to renew the letter of credit, Chin again contacted Karzmer. Karzmer complained that the letter of credit requirement was "a financial burden" and assured Chin that "money would never be a problem." Based on Karzmer's alleged promise of prompt payment, Chin agreed to waive the requirement.

Predictably, Karzmer offers a differing account. He asserts that Chin never asked Captiva to renew the letter of credit but instead immediately waived the requirement when the initial letter expired. Further, he denies promising Chin that Captiva would promptly pay all invoices if Viz waived the letter of credit requirement.

In the spring of 2000, the parties' relationship deteriorated. Captiva's customers began returning large numbers of comics to Captiva, and, in May 2000, Captiva sought a return authorization in the amount of $741,079.02 from Viz. Captiva claimed that in late 1999, when it began purchasing large quantities of merchandise, Chin had agreed to accept returns and that Chin had repeatedly reiterated this agreement both orally and in writing. Viz refused to issue the return authorization, asserting that Chin never authorized any returns and that the Agreement did not provide for returns. However, Viz did re-date the relevant invoices, which afford-

ed Captiva additional time to pay Viz for the merchandise returned to Captiva.

The parties were unable to resolve their disagreement concerning returns. On October 31, 2000, Captiva filed suit against Viz in the United States District Court for the Northern District of Ohio, averring, *inter alia,* that Viz had breached its oral agreement to accept returns. On March 12, 2001, Viz filed a counterclaim against Captiva, averring, *inter alia,* that Captiva had breached the Agreement by failing to pay $1,323,132.68 worth of invoices. On April 16, 2001, Viz filed a third-party complaint against Karzmer, asserting a fraud claim.

On September 5, 2001, the district court entered an order disposing of the parties' summary judgment motions. The court granted Karzmer's motion for summary judgment in full. The court granted Viz's motion for summary judgment in part. Specifically, it granted Viz summary judgment on its account stated and breach of contract claims—but only as to the merchandise which was not returned by Captiva's customers but for which Captiva had not paid Viz. The court found that a genuine issue of material fact existed as to whether the parties had reached an agreement on the issue of returns, and it therefore denied Viz summary judgment on the balance of its affirmative claims and on Captiva's claims against Viz. On September 7, 2001, Captiva filed for Chapter 11 bankruptcy. Accordingly, on September 11, 2001, the district court issued an order perpetually staying the proceedings, subject to reopening upon motion of a party in interest.

On October 5, 2001, Viz filed a notice of appeal. However, the district court's Sep-

---

**3.** During his deposition, Chin did not offer a precise time-line. Instead, he vaguely testified that "some period of time" elapsed be-

tween Karzmer's assurance of compliance and his subsequent request for a waiver of the letter of credit requirement.

tember 5 order left claims pending and had not been certified as a final judgment under Fed.R.Civ.P. 54(b). Therefore, on February 2, 2002, this court entered an order holding the appeal in abeyance in order to allow Viz to move the district court for a certification of final judgment pursuant to Fed.R.Civ.P. 54(b). On March 28, 2002, the district court entered an order certifying its order granting Karzmer summary judgment as a final judgment. On October 20, 2003, the district court issued a revised certification order, which corrected a misstatement in the March 28 certification order.

## ANALYSIS

This Court reviews a district court's grant of summary judgment *de novo*. *Williams v. Gen'l Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999). The evidence should be viewed in the light most favorable to the non-moving party, and summary judgment should be granted only where there is no genuine issue of material fact. *Id.*

Under Ohio law, the elements of fraud are (1) a representation or, where there is a duty to disclose, a concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that such knowledge can be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464, 700

N.E.2d 859, 868 (1998). To establish a claim for fraud, the complaining party must prove all of these elements. *Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 742 N.E.2d 1198, 1205 (2000).

The instant case involves two strains of fraud—fraud in the inducement and promissory fraud. "A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 692 N.E.2d 574, 578 (1998). The fraud relates not to the nature or purport of the contract, but to the facts inducing its execution. *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 552 N.E.2d 207, 210 (1990).[4] In contrast, a claim of promissory fraud arises when a party makes a promise without the intention of performing. *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 446 (6th Cir.1985).

Promissory fraud represents an exception to the general rule that a claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct. *Martin*, 742 N.E.2d at 1205. Promissory fraud occurs "where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise." *Williams v. Edwards*, 129 Ohio App.3d 116, 717 N.E.2d 368, 374 (1998). "In such a case, the individual possesses actual fraudulent intent and a claim for fraud may be asserted against him." *Williams*, 717 N.E.2d at 374; *see also Tibbs v. Nat'l Homes Constr. Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218, 1223 (1977) (reasoning that in such

4. "A classic case of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract. Examples include a party to a release misrepresenting the economic value of the released claim, or one party employing coercion or duress to cause the other party to sign an agreement." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 692 N.E.2d 574, 578 (1998) (citation omitted).

cases "the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent").

Importantly, "the mere proof of nonperformance does not prove a lack of intent to perform." *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 666 N.E.2d 235, 243 (1995) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3rd Cir. 1993)). "It would be as wrong morally as legally, as offensive to logic as to law, to hold that mere denial and nonperformance are evidence that, if a promise was made, it was made fraudulently." *Id.* (quoting *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1403 (8th Cir.1993)).

### 1. Representations Concerning the "No Return" Policy.

Viz alleges a trio of misrepresentations concerning Captiva's return policy. Specifically, it contends that, during the negotiation of the Agreement, Karzmer falsely stated that (1) Captiva intended to honor a "no return" policy in its dealings with Viz, (2) Captiva did not accept returns from its current customers, and (3) Captiva had sufficient market power to prohibit returns from its retail customers.

The district court addressed only the first argument. It noted that Viz relied on two pieces of evidence to establish that Karzmer did not intend to honor his alleged promise that Captiva would not return product to Viz: (1) Captiva's attempt to return product to Viz, and (2) Karzmer's testimony that large retailers have sufficient market power to compel their suppliers to accept returns. Rejecting Viz's argument, the district court observed,

> Viz offers no evidence showing that Karzmer expected that Captiva's retail customers would return unsold comic books, or that Karzmer expected or planned to return those comics to Viz.

Whether or not Karzmer knew or expected products to be returned to Captiva does not sufficiently establish that he lacked present intent to perform his promise not to return products to Viz. Without more, Viz has failed to provide any evidence showing that Karzmer lacked the intention to perform at the time he made his promise.

J.A. at 38.

On appeal, Viz relies on the same evidence. It notes that, after signing the contract, Captiva accepted returns from its customers, made "special arrangements" for returns with Best Buy, and attempted to return product to Viz. Further, it points to Karzmer's testimony that large retailers such as Wal–Mart and K–Mart, to which Captiva hoped to sell the "multi-packs," enjoy sufficient market power to compel their suppliers to accept returns. Taken together, Viz argues, this evidence permits a reasonable trier of fact to infer that Karzmer did not intend to honor his alleged promise not to return merchandise to Viz.

The district court properly concluded that Viz has not created a genuine issue of material fact as to Karzmer's intent at the time of his alleged promise. As it observed, that Karzmer did not abide by his alleged promise does not, without more, permit the conclusion that he *never* intended to honor the promise. *See Wall*, 666 N.E.2d at 243 ("Fraud cannot be predicated on the mere fact that a promise has been broken") (quoting *International Travel Arrangers*, 991 F.2d at 1403). Similarly, that Karzmer was cognizant of the market power of large retailers does not mean that he intended from the start to return product to Viz. Viz has not mustered any evidence suggesting that Karzmer expected that his retailers customers, including large retailers such as K–Mart

and Wal–Mart, would attempt to return merchandise. Nor has Viz mustered any evidence suggesting that, if Captiva's customers attempted to return merchandise, Captiva intended to accept the returns and to return the merchandise to Viz.[5]

In sum, without more, Karzmer's breach of his alleged promise and his awareness that, generally speaking, large retailers can coerce their suppliers into accepting returns, do not allow a reasonable trier of fact to conclude that Karzmer had no intention of keeping his alleged promise *at the time he made it. See Martin,* 742 N.E.2d at 1205 (emphasizing that a claim of promissory fraud lies only where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise). To hold otherwise would be to permit Viz to transform its breach of contract claim into a fraud claim.

■ Viz's second claim is scuttled by an absence of evidence that Karzmer's statement was false. Karzmer's statement that Captiva did not accept returns from its present customers, which he admits making, was a statement of existing fact. However, Viz has not offered evidence that would permit a reasonable trier of fact to conclude that this statement was false. Viz has not shown that any of Captiva's

then-current customers enjoyed a contractual right of return, that any of these customers actually attempted to return any merchandise, or that Captiva actually accepted any returns.

■ Finally, Viz's third claim fails for an absence of evidence of any representation made by Karzmer. Viz claims that Karzmer misrepresented "Captiva's size and market presence, its relationship with the large retailers, and its power to prohibit product returns from its retail customers." However, Viz fails to identify the specific representations allegedly made by Karzmer.[6] Quite obviously, this omission is fatal is Viz's fraud claim.[7]

## 2. Representations Concerning the Renewal of the Letter of Credit.

Viz charges that Karzmer made a pair of misrepresentations concerning the letter of credit requirement. Specifically, Viz alleges that (1) when the initial letter of credit expired, Karzmer promised to renew the letter of credit without any intention of fulfilling the promise, and (2) shortly thereafter, Karzmer falsely stated that Captiva had undertaken efforts to renew the letter of credit. The district court concluded that Viz did not "offer any evidence to show that Karzmer made fraudu-

---

5. In fact, Chin testified that Karzmer told him during the negotiation of the Agreement that if there were returns "that would be his problem." J.A. at 347.

6. It is possible that Viz believes that the "corporate profile," which Captiva provided to Viz during the negotiation of the Agreement, contains an actionable misrepresentation. The profile, which is dated June 28, 1999, states that Captiva's "annual sales exceed $5,000,000 per year." J.A. at 231. In contrast, Captiva's 1998 federal income tax form lists "Gross receipts or sales" of a substantially smaller amount. J.A. at 536.

  However, even assuming the equivalence of "annual sales" for purposes of the profile

with "gross receipts and sales" for income tax purposes, and also assuming that it was actually Karzmer who sent the profile and who came up with the $5,000,000 figure, Viz has not presented credible evidence that it entered into the Agreement in justifiable reliance on this statement.

7. To the extent that Viz contends that Karzmer concealed information concerning Captiva's size and market presence, it has not demonstrated that a duty of disclosure existed, that Karzmer concealed that information with the intent of misleading Viz, or that Viz justifiably relied on the concealment.

lent promises regarding the letters of credit." J.A. at 39.

■ The district court properly granted summary judgment on Viz's claims. As for the first claim, Viz has not created a genuine issue of material fact concerning Karzmer's intent at the time he allegedly promised to renew the letter of credit. To establish that Karzmer did not intend to honor the alleged promise, Viz relies solely on the testimony of James Vitullo and Harry Steck, the Captiva employees responsible for the letter of credit, that they took no steps to renew the initial letter of credit. By itself, this evidence is not sufficient to sustain the inference that Karzmer lacked present intent to perform the promise.[8] *See Wall,* 666 N.E.2d at 243 ("The mere proof of nonperformance does not prove a lack of intent to perform" (quoting *Lightning Lube,* 4 F.3d at 1186)).

■ As for the second claim, Viz has not identified any representations made by Karzmer concerning efforts to renew the letter of credit. Chin testified that Karzmer promised that Captiva would renew the letter of credit, but he did not testify that Karzmer stated that efforts to renew the letter were underway. J.A. at 354–60. Tony Trinh, a Viz employee, testified that Harry Steck, a Captiva employee, not Karzmer, informed him that the new letter of credit was "on the way." J.A. at 513–15. Obviously, Viz cannot sustain a fraud claim against Karzmer in the absence of any alleged representation by Karzmer.

### 3. Representations Concerning the Payment of Invoices.

■ With respect to the payment of invoices, Viz again dresses a breach of contract claim in the guise of promissory

fraud. Viz contends that, in connection with the waiver of the letter of credit requirement, Karzmer promised that Captiva would promptly pay all invoices. However, the only evidence in the record that arguably supports the conclusion that Karzmer made this promise without intending to perform is the fact that Captiva has not paid certain invoices. As the district court rightly concluded, "The fact that payments were late or that amounts remain outstanding is not enough, in itself, to show that Karzmer did not intend to perform when he made the promises alleged." J.A. at 38.

### CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

---

8. Moreover, Viz agreed to waive the letter of credit requirement shortly after the alleged promise, and it has not explained how it was proximately injured by its supposed reliance on the alleged misrepresentation.