OPINION
{¶ 1} Defendants-appellants, Calex Corporation ("Calex") and Wooster Products, Inc. ("Wooster"), appeal from summary judgment in favor of plaintiff-appellee, Interstate Gas Supply, Inc. ("IGS"), and third-party defendant-appellee, Greg Jones. For the following reasons, we affirm in part and reverse in part the judgment of the trial court.
 {¶ 2} In May 2003, IGS sued Calex and Wooster, asserting three causes of action: (1) breach of contract, (2) claim for amount due on account, and (3) quantum meruit/unjust enrichment. In its complaint, IGS alleged that in November 2001, IGS contracted with Calex and Wooster to supply natural gas to these companies. According to IGS, after IGS supplied Calex and Wooster with natural gas pursuant to the contract of November 2001, Calex and Wooster failed to pay invoices for January, February and March 2003, and they failed to pay other adjusted charges. IGS therefore sought $477,301.42 plus interest, costs, and attorney's fees.
 {¶ 3} IGS later moved for default judgment against Calex and Wooster. After granting a motion by Calex and Wooster for an extension of time in which to move or plead, the trial court contemporaneously denied as moot IGS's motion for default judgment.
 {¶ 4} Calex and Wooster eventually answered IGS's complaint, counterclaimed against IGS, and filed third-party claims against two parties: Greg Jones, an employee of IGS, and East Ohio Gas Company, dba Dominion East Ohio. In their counterclaim against IGS, Calex and Wooster asserted five causes of action: (1) breach of contract, (2) intentional misrepresentation, (3) negligent misrepresentation, (4) breach of the covenant of good faith and fair dealing, and (5) promissory estoppel/detrimental reliance. In their third-party complaint against Mr. Jones and Dominion East Ohio, Calex and Wooster asserted four causes of action: (1) intentional misrepresentation against Mr. Jones, (2) negligent misrepresentation against Mr. Jones, (3) negligence against Dominion East Ohio, and (4) indemnification/contribution against Dominion East Ohio.
 {¶ 5} IGS and Mr. Jones answered Calex and Wooster's counterclaim and third-party complaint respectively. Dominion East Ohio also answered Calex and Wooster's third-party complaint and asserted a counterclaim against Calex and Wooster for contribution or indemnification.
 {¶ 6} Later, IGS and third-party defendant-appellee Mr. Jones jointly moved for summary judgment as to IGS's claims against Calex and Wooster and as to Calex and Wooster's claims against IGS and Mr. Jones.
 {¶ 7} While this motion for summary judgment was before the trial court, in a stipulated notice of dismissal, Calex, Wooster, and Dominion East Ohio dismissed with prejudice Calex and Wooster's claims against Dominion East Ohio and Dominion East Ohio's claims against Calex and Wooster. However, all claims by Calex and Wooster against IGS and Mr. Jones were unaffected by Calex, Wooster, and Dominion East Ohio's stipulated notice of dismissal.
 {¶ 8} Thereafter, on September 21, 2004, the trial court granted summary judgment in favor of IGS and Mr. Jones as to all outstanding claims. From the trial court's judgment, Calex and Wooster appeal. Calex and Wooster assert six assignments of error for our consideration:
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY WEIGHING AND IGNORING EVIDENCE AND GRANTING SUMMARY JUDGMENT IN FAVOR OF IGS WHEN QUESTIONS OF FACT EXIST REGARDING WHETHER IGS SATISFIED ITS CONTRACTUAL OBLIGATIONS.
II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY FAILING TO APPORTION DAMAGES BETWEEN CALEX AND WOOSTER BASED UPON THE AMOUNT OF GAS EACH SEPARATE ENTITY ACTUALLY CONSUMED, AND IMPROPERLY HOLDING APPELLANTS JOINTLY LIABLE FOR THE ENTIRE AMOUNT OF DAMAGES ASSERTED BY IGS.
III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY WEIGHING AND IGNORING EVIDENCE AND GRANTING SUMMARY JUDGMENT IN FAVOR OF IGS WHEN QUESTIONS OF FACT EXIST REGARDING WHETHER IGS SUBSTANTIALLY PERFORMED ITS CONTRACTUAL OBLIGATIONS.
IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY WEIGHING AND IGNORING EVIDENCE AND GRANTING SUMMARY JUDGMENT IN FAVOR OF IGS WHEN QUESTIONS OF FACT EXIST REGARDING WHETHER IGS HAS SATISFIED ITS BURDEN OF PROVING DAMAGES WITH REASONABLE CERTAINTY.
V. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY WEIGHING AND IGNORING EVIDENCE AND GRANTING SUMMARY JUDGMENT IN FAVOR OF IGS WITH RESPECT TO APPELLANTS' COUNTERCLAIM FOR BREACH OF CONTRACT.
VI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY WEIGHING AND IGNORING EVIDENCE AND GRANTING SUMMARY JUDGMENT IN FAVOR OF IGS WHEN QUESTIONS OF FACT EXIST REGARDING APPELLANTS' CLAIMS FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION AGAINST IGS AND THIRD-PARTY DEFENDANT GREG JONES.
 {¶ 9} At the outset, appellees challenge this court's jurisdiction to consider Calex and Wooster's assignment of error as to third-party defendant-appellee Mr. Jones. Appellees contend that, in Calex and Wooster's notice of appeal, they excluded that portion of the trial court's judgment concerning Mr. Jones. Appellees therefore assert that issues related to Mr. Jones are not properly before this court. Relying upon App.R. 3 andBuckeye Union Ins. Co. v. Stiffler (1982), 81 Ohio App.3d 227, appellees reason that this court should dismiss the portion of the present appeal that is directed toward Mr. Jones. We disagree.
 {¶ 10} "Subject-matter jurisdiction is a court's power over a type of case. It is determined as a matter of law and, once conferred, it remains." Pratts v. Hurley, 102 Ohio St.3d 81,2004-Ohio-1980, at ¶ 34; see, also, Morrison v. Steiner (1972),32 Ohio St.2d 86, paragraph one of the syllabus (holding, in relevant part, that "[s]ubject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits"). Jurisdiction is a condition precedent to a court's ability to hear a case. State ex rel. Tubbs Jones v. Suster (1998),84 Ohio St.3d 70, 75, reconsideration denied (1999),84 Ohio St.3d 1475. "If a court acts without jurisdiction, then any proclamation by that court is void." Id., citing Patton v.Diemer (1988), 35 Ohio St.3d 68.
 {¶ 11} In Transamerica Ins. Co. v. Nolan (1995),72 Ohio St.3d 320, the Supreme Court of Ohio held:
Pursuant to App.R. 3(A), the only jurisdictional requirement for a valid appeal is the timely filing of a notice of appeal. When presented with other defects in the notice of appeal, a court of appeals is vested with discretion to determine whether sanctions, including dismissal, are warranted, and its decision will not be overturned absent an abuse of discretion.
Id. at syllabus.
 {¶ 12} Here, Calex and Wooster timely filed their notice of appeal. Because under App.R 3(A) the only jurisdictional requirement for a valid appeal is the timely filing of a notice of appeal, Transamerica Ins. Co., supra, at syllabus, and because in this case Calex and Wooster timely filed a notice of appeal, we therefore reject appellees' contention that this court lacks jurisdiction.
 {¶ 13} Nevertheless, having concluded that jurisdiction properly lies, we shall also consider whether appellants' notice of appeal contains defects that warrant dismissal of that portion of the present appeal that is directed toward Mr. Jones.
 {¶ 14} In Buckeye Union Ins. Co., supra, Buckeye Union Insurance Company appealed from a judgment dismissing Ralph E. Mooney from an action involving a motor vehicle accident. Buckeye Union Insurance Company's notice of appeal stated:
"Notice is hereby given that Buckeye Union Insurance Co. and C W Trucking Co., Plaintiffs, hereby appeal to the Court of Appeals of Lorain County, Ohio, Ninth District Court from theorder dismissing Defendant Ralph E. Mooney from the action
entered in this action on the eleventh day of April, 1991."
Id. at 231. (Emphasis sic.)
 {¶ 15} After reviewing the record, the Ninth District Court of Appeals concluded that Buckeye Union Insurance Company limited its appeal to the judgment dismissing Mr. Mooney from the action. The appellate court reasoned that Buckeye Union Insurance Company was therefore precluded from asserting an assignment of error against another defendant concerning a negligent entrustment claim. Id.
 {¶ 16} In the present case, in their notice of appeal filed on September 28, 2004, Calex and Wooster stated:
Now come Defendants/Third-Party Plaintiffs, Calex Corporation dba Calex ("Calex"), and Wooster Products, Inc. ("Wooster"), by and through their undersigned counsel, Henderson, Covington, Messenger, Newman Thomas Co., L.P.A., and timely file this Notice of Appeal with the Tenth District Court of Appeals from the September 21, 2004 Journal Entry and the August 30, 2004 Decision of the Franklin County Common Pleas Court granting summary judgment in favor of Plaintiff. A copy of the September 21, 2004 Journal Entry is attached hereto as Exhibit "A" and made a part hereof by reference thereto, and a copy of the August 30, 2004 Decision is attached as Exhibit "B" and made a part hereof by reference thereto.
The September 21, 2004 Journal Entry constitutes a final appealable order pursuant to R.C. 2505.02.
(Emphasis added.)
 {¶ 17} Whether Calex and Wooster's notice of appeal indicates that they are appealing from only that portion of the judgment concerning IGS, the plaintiff, or whether Calex and Wooster's notice of appeal indicates that they are appealing from the entire judgment is disputable.
 {¶ 18} In Maritime Mfrs., Inc. v. Hi-Skipper Marina (1982),70 Ohio St.2d 257, 259, the Supreme Court of Ohio stated that the purpose of a notice of appeal is to "`* * * apprise the opposite party of the taking of an appeal. * * * If this is done beyond (the) danger of reasonable misunderstanding, the purpose of the notice of appeal is accomplished.'" (Citations omitted.)
 {¶ 19} Absent any showing of prejudice by appellees, we do not conclude that Calex and Wooster's notice of appeal is so defective that this court should dismiss the portion of the present appeal that is directed toward Mr. Jones. We therefore reject appellees' contention to dismiss the portion of the present appeal that is directed toward Mr. Jones.
 {¶ 20} Appellate review of a lower court's granting of summary judgment is de novo. Mitnaul v. Fairmount PresbyterianChurch, 149 Ohio App.3d 769, 2002-Ohio-5833, at ¶ 27. "`Denovo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial.'" Id., quoting Brewer v. Cleveland City Schools (1997),122 Ohio App.3d 378, citing Dupler v. Mansfield Journal (1980),64 Ohio St.2d 116, 119-120, certiorari denied (1981),452 U.S. 962, 101 S.Ct. 3111.
 {¶ 21} Summary judgment is proper when a movant for summary judgment demonstrates: (1) no genuine issue of material fact exists; (2) the movant is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56; State ex rel. Grady v. State Emp. Relations Bd. (1997),78 Ohio St.3d 181, 183.
 {¶ 22} Under Civ.R. 56(C), a movant bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt (1996),75 Ohio St.3d 280, 293. Once a movant discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.Dresher, at 293; Vahila v. Hall (1997), 77 Ohio St.3d 421,430; Civ.R. 56(E).
 {¶ 23} Defendants' first assignment of error asserts that genuine issues of material fact exist concerning whether IGS satisfied its contractual agreement. Specifically, Calex and Wooster assert that: (1) whether IGS used "reasonable efforts" to provide a fixed price as required by Exhibit B of the agreement is a question of fact for the trier of fact; and (2) whether IGS provided adequate notice of an intent to charge a variable price is also a question of fact for the trier of fact. Defendants' third assignment of error asserts that genuine issues of material fact exist concerning whether IGS substantially performed its contractual obligations. Because Calex and Wooster's first and third assignments of error are interrelated, we will jointly consider them.
 {¶ 24} "`A contract is an agreement, upon sufficient consideration, between two or more persons to do or not to do a particular thing.'" Powell v. Grant Med. Ctr.,148 Ohio App.3d 1, 2002-Ohio-443, at ¶ 27, quoting Nilavar v. Osborn (2000),137 Ohio App.3d 469, 483, appeal not allowed, 90 Ohio St.3d 1405, quoting Lawler v. Burt (1857), 7 Ohio St. 340, 350; see, also, Restatement of the Law 2d, Contracts (1981) 5, Section 1 (defining "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty"). Here, the parties do not dispute that the "Natural Gas Sales Agreement" of November 2001 ("Agreement") involving IGS, Calex, and Wooster constitutes a valid written contract that conferred benefits and imposed duties upon the parties.
 {¶ 25} The Agreement provided, in relevant part:
The price per MCF delivered to the city gate for all gas delivered within the monthly tolerance pursuant to the contract will be fixed at $3.96 per MCF for the period December 1, 2001 to Mar. 31, 2002. Seller will use reasonable efforts to continue the Agreement for additional one-year period (s) at the fixed price rate for the monthly volumes described under Exhibit A. If Seller is unable to continue the fixed price rate, then Seller will notify Buyer 30 days before the anniversary date and the price will switch to the Variable Price described in Option 1 above.
(Agreement, at Exhibit B.)[1]
 {¶ 26} Ordinarily, whether a party to a contract used "reasonable efforts" is a question of fact for the fact finder. See, e.g., Beatley v. Schwartz, Franklin App. No. 03AP-911,2004-Ohio-2945, at ¶ 12 (stating that "[w]hether a landlord made reasonable efforts to mitigate damages is a question of fact to be resolved by the trier of fact"). The issue concerning whether a party to a contract used "reasonable efforts" only becomes a question of law when reasonable minds can come to but one conclusion. See, e.g., Tucker v. Kroger Co. (1999),133 Ohio App.3d 140, 147-148 (observing that the issue of whether an employee is acting within the scope of employment is a question of fact and this issue becomes a question of law when reasonable minds can come to but one conclusion). Cf. New Towne L.P. v.Pier 1 Imports (U.S.) Inc. (1996), 113 Ohio App.3d 104, 109, at fn. 2 (stating that "the issue of whether appellee made reasonable efforts [to mitigate damages] is a question of fact inappropriate for consideration on summary judgment").
 {¶ 27} "Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Skivolocki v. E. Ohio Gas Co. (1974),38 Ohio St.2d 244, paragraph one of the syllabus. "When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." Shifrin v. Forest CityEnterprises, Inc. (1992), 64 Ohio St.3d 635, 638, citingAlexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,246. "[N]o clear standard has evolved to determine the level of lucidity necessary for a writing to be unambiguous." State v.Porterfield, 106 Ohio St.3d 5, 2005-Ohio-3095, at ¶ 11. "Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed. Otherwise allegations of ambiguity become self-fulfilling." Id.
 {¶ 28} Here, as evidenced by the plain language of the Agreement, the purpose of requiring IGS to provide 30-day notice to Calex and Wooster before the Agreement's anniversary date was to inform Calex and Wooster that, despite employing reasonable efforts, IGS was unable to maintain the fixed price rate of $3.96 per MCF, and to inform Calex and Wooster that the pricing of natural gas would switch to a variable rate.
 {¶ 29} According to the evidence, in February 2002, Mr. Jones advised G.K. Arora, president and CEO of Calex Corporation and Wooster Products, Inc., that he should consider "locking in" a fixed price for future natural gas deliveries. On February 14, 2002, Mr. Jones advised Mr. Arora as follows: "`And we have been trading at the $2.40-$2.60 range. So we're below, way below average on the, on, you know, across, uh, over a six year period. So, you know, I think we're getting close to a time where you may want to lock in something long term.'" (Transcription of February 14, 2002, telephone call.)
 {¶ 30} Later, in March 2002 through telephone calls and other communication, Mr. Jones provided to Mr. Arora price quotations that were less than the fixed price rate of $3.96 per MCF. In an affidavit, Mr. Jones averred:
On March 6, 2002, I e-mailed a fixed price quote to Mr. Aurora [sic] for one year beginning April 1, 2002 through March 31, 2003 of $3.76 per MCF and a two year price quote beginning April 1, 2002 through March 31, 2004 of $4.03 per MCF. On the same day I also e-mailed Mr. Aurora [sic] a fixed price quote for an eighteen-month period beginning April 1, 2002 of $3.86 per MCF.
(March 3, 2004 Jones Affidavit, at paragraph 35.)
 {¶ 31} On March 11, 2002, in a telephone conversation, Mr. Jones advised:
[Mr. Jones]: "* * * [W]e're just trading up `cause a short covering in the market. A lot of people are panicking as far as . . . You see the consensus is, is that, you know, the reason why our storage situation is where it is because of, uh, (deep breath) uh, not because, uh, not because of a fix on the production side but a lack of demand. They're starting to see that demand coming back and people are short in the market, they're trying to figure out when to buy, so they're, they're just out there panicking right now. Now how far are they going to panic and drive this thing up, we don't know. Will there be a correction? Probably. How much will it correct? We don't know that either. Uh, [w]hich is why were out telling people, at least in our opinion, uh, you know about, a, a month to a month and half ago, or even within the last 3 weeks, to go ahead and lock in at a longer term. Uh, you know, we think, in general, we're bullish, and we think it's going to go up over the long term, but, uh, so I would buy, I would buy here sometime in the near future, but I don't know, uh, you know, I don't know, wha, wha, if and when we're going to correct on this move."
[Mr. Arora]: "It has, it has moved so, so quick, so fast."
[Mr. Jones]: "Yep. And, . . ."
[Mr. Arora]: "Yeah."
[Mr. Jones]: "And the reason for it is because that, because there, the rig counts down and they're seeing demand come back, and the production problem that cause problems, not this winter, but the past winter really has not been fixed. It was starting to be fixed, but the market crashed and these guys backed off drilling."
[Mr. Arora]: "Yeah, when, when we go on month to month basis, uh (unintelligible) it's a full requirement we don't have to, you know, make any (?) Because, (?) high numbers (?) because it's a full requirement. You know, you know what I'm saying? Sss, See it. Hello?"
[Mr. Jones]: "Yeah, I'm, I'm trying to, I'm trying to understand what you're saying."
[Mr. Arora]: "See in April, we go month to month, ok."
[Mr. Jones]: "Right and you go, uh, you go on a inside Ferc [sic][2] market based rate."
[Mr. Arora]: "Right."
[Mr. Jones]: "With the exception of that gas that's, uh, that's all[.]"
[Mr. Arora]: (interrupting [Mr. Jones]) "Yeah that (unintelligible) we will pay for that yeah, right."
[Mr. Jones]: "Right."
[Mr. Arora]: "That's right, for all the full months, whatever is not used."
[Mr. Jones]: "Right."
[Mr. Arora]: "Yeah. We're going to . . . But what I'm saying inside Ferc * * * [Y]ou know there's no, it's the full requirement, so I don't have, you know, any commitment for the volume. This is what I'm saying."
[Mr. Jones]: "Right. That's correct."
* * *
[Mr. Arora]: "So anyway, it looks like, uh, at this point, we miss the whole thing, I don't know (laughing)."
[Mr. Jones]: "Well, I don't know, I mean. Our low is like, our low one year strip was like 2.42 and now we're trading like, uh, hold on . . . * * *"
[Mr. Jones]: "Ok. And what I'm referring to is the one year strip going out from April, uh April."
[Mr. Arora]: "Right."
[Mr. Jones]: "About 3.30 right now."
[Mr. Arora]: "[Oh] 3.30? It was 2.88 or something like that. And then[.]"
[Mr. Jones]: "Yeah and 2.40[,] 2.42 is about the lowest, so we're about .88 cents from the low that we hit within the last couple of months."
[Mr. Arora]: "Right. Anyway, just hang in there, ok?"
[Mr. Jones]: "Is that what you want to do?"
[Mr. Arora]: "Yeah. Just, uh, no I got the fax from you sometime back, uh I think, what was the price at that time, but"
[Mr. Jones]: "Uh, Let me check. I, I usually keep a note of it. I, I emailed, well I quoted a on year, This was back on the 6th."
[Mr. Arora]: "Right."
[Mr. Jones]: "Obviously things have changed considerably since, since then. Uh, 3.76, a 2 ear[sic], 4.03; 18 months was 3.86."
[Mr. Arora]: "Right, I don't remember where the 2.40 was the number, I don't know when was that. Did I get a quote at that point, I uh"
[Mr. Jones]: "Uh at the 2.42 level?"
* * *
[Mr. Jones]: "Let me look, and I'll tell you. Hold on one second and see what I did. Bear with me please. You got a minute?"
* * *
[Mr. Jones]: "On, uh, Feb. 1st we were around 2.42. And thru the 8th we were around 2.40 (silence) the low range 2.40 range (?) week of Feb.?"
* * *
[Mr. Jones]: "Ok. I sent you a quote, uh, that was February 1st on January 28th, which is right in that time period. I faxed you a quote * * *"
[Mr. Arora]: "Oh for the 8th?"
[Mr. Jones]: "On the 28th of January."
(Transcription of March 11, 2002, telephone call.)
 {¶ 32} Four days later, on March 15, 2002, Mr. Jones and Mr. Arora had this exchange:
[Mr. Jones]: "* * * I just wanted to give you a call real quick, uh. Yesterday, obviously, we traded up a little bit. And, uh, we're up, uh, on the front month about .11 cents this morning."
[Mr. Arora]: "Ok"
[Mr. Jones]: "So, we, we dipped for a little bit and the market's giving back everything that, uh, that it gave us, so I just wanted to make sure you were aware of that, that we are trading back up again."
[Mr. Arora]: "Back up again, ok (laugh). What's the reason for that? Why?"
[Mr. Jones]: "There's just, there's just some panic in the market. I mean that in general you, you have, uh, um, people are bullish out there. You got, um"
[Mr. Arora]: "Hmm"
* * *
[Mr. Arora]: "* * * And, uh, so what is the 12-month strip right now? What is that 12 month at this point, uh?"
[Mr. Jones]: "Uh, [h]old on one second if you would please."
[Mr. Arora]: "Sure" (?)
(Phone put down noise, silence)
[Mr. Jones]: "All months haven't traded yet, but it's around 3.23."
[Mr. Arora]: "Uh, that is, that is strip point right strip ok. Yeah, I think, think we just hang in there."
[Mr. Jones]: "Ok"
[Mr. Arora]: "Ok. Like I, duh, I said now we go month by month inside Ferc."
[Mr. Jones]: "Right"
(Transcription of March 15, 2002, telephone call.)
 {¶ 33} Beginning in February 2002, Mr. Jones informed Mr. Arora that prices for natural gas were showing an upward trend and that it was advisable to "lock in" a fixed price for future natural gas deliveries. In March 2002, before the contract's anniversary date, Mr. Jones also provided Mr. Arora quotations for a fixed price at a lower rate than $3.96 per MCF. However, Mr. Arora declined to secure any fixed term rates. During these telephone calls, Mr. Arora also expressed an understanding that beginning in April 2002 the pricing structure would be based upon a variable rate. Calex and Wooster have proffered no contrary evidence to rebut this evidence.
 {¶ 34} Calex and Wooster assert that it is uncontroverted that prior to the contract's anniversary date, IGS failed to give notice that it could not continue the fixed price. Calex and Wooster further assert that a question of fact exists concerning whether IGS substantially performed its contractual obligations.
 {¶ 35} "The long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." Ohio Farmers Ins.Co. v. Cochran (1922), 104 Ohio St. 427, paragraph two of the syllabus. "A court should confine the application of the doctrine of substantial performance to cases where the party has made an honest or good faith effort to perform the terms of the contract." Burlington Resources Oil Gas Co. v. Cox (1999),133 Ohio App.3d 543, 548, citing Ashley v. Henahan (1897),56 Ohio St. 559, paragraph one of the syllabus. "For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." Hansel v.Creative Concrete Masonry Constr. Co., 148 Ohio App.3d 53,2002-Ohio-198, at ¶ 12, citing F.C. Mach. Tool Design, Inc. v.Custom Design Techonologies, Inc. (Dec. 27, 2001), Stark App. No. 2001CA00019, citing Wengerd v. Martin (May 6, 1998), Wayne App. No. 97CA0046. Furthermore, "[w]hen the facts presented in a case are undisputed, whether they constitute performance or a breach of the contract, is question of law for the court." Luntzv. Stern (1939), 135 Ohio St. 225, 237.
 {¶ 36} In an affidavit dated April 7, 2004, Mr. Arora avers that "[p]rior to the Anniversary Date, IGS never provided notice to either Calex or Wooster that IGS was unable to continue providing natural gas at the fixed price of $3.96 per thousand cubic feet of natural gas ("MCF"), after the Anniversary Date." (Id., at paragraph 14.)
 {¶ 37} According to the evidence, prior to the Agreement's anniversary date IGS specifically may not have informed Calex or Wooster that it was unable to continue to provide natural gas at the fixed rate of $3.96 per MCF after the contract's anniversary date. However, prior to the contract's anniversary date, IGS did inform Calex and Wooster that natural gas prices were trending upward; IGS advised Calex and Wooster that "locking in" a fixed price for future natural gas deliveries was advisable; and IGS provided Calex and Wooster with quotations for a fixed price lower than $3.96 per MCF. Calex and Wooster have not proffered any evidence to rebut IGS's evidence that it informed Calex and Wooster of the upward trend of natural gas prices and that it offered quotations for fixed prices lower than $3.96 per MCF.
 {¶ 38} While IGS's performance technically may have deviated from the Agreement's express terms, we cannot conclude that, under the facts and evidence of this case, such a technical deviation is sufficient to constitute breach of contract. See, e.g., Ohio Farmers Ins. Co., supra, at paragraph two of the syllabus (holding that merely nominal, trifling, or technical departures are not sufficient to constitute breach of contract); see, also, Roger J. Au Son, Inc. v. N.E. Ohio Regional SewerDist. (1986), 29 Ohio App.3d 284, 292 (stating that "[t]here is no reason to deny the claims for lack of written notice [if a party] was aware of [a disputed fact] and had a proper opportunity to investigate and act on its knowledge, as the purpose of the formal notice would thereby have been fulfilled").
 {¶ 39} Here, prior to the Agreement's anniversary date, by informing Calex and Wooster that natural gas prices were trending upward; by advising that Calex and Wooster should "lock in" a fixed future price for natural gas; by providing Calex and Wooster with quotations for a fixed price lower than $3.96 per MCF, IGS substantially performed under the Agreement. Furthermore, according to the evidence, Mr. Arora expressed an understanding that beginning in April 2002 the pricing structure would be based upon a variable rate.
 {¶ 40} Therefore, even construing the evidence in favor of Calex and Wooster, we conclude that reasonable minds can come to but one conclusion, namely, that IGS substantially performed its contractual obligations and that IGS used "reasonable efforts" to provide a fixed price as required by Exhibit B of the Agreement and that IGS provided adequate notice of an intent to charge a variable price.
 {¶ 41} Calex and Wooster contend, however, that reasonable minds could conclude that Calex and Wooster did not understand that they would be billed at a variable rate after the contract's anniversary date.
 {¶ 42} On March 11, 2002, Mr. Jones and Mr. Arora had the following exchange:
[Mr. Arora]: "Yeah, when, when we go on month to month basis, uh (unintelligible) it's a full requirement we don't have to, you know, make any (?) Because, (?) high numbers (?) because it's a full requirement. You know, you know what I'm saying? Sss, See it. Hello?"
[Mr. Jones]: "Yeah, I'm, I'm trying to, I'm trying to understand what you're saying."
[Mr. Arora]: "See in April, we go month to month, ok."
[Mr. Jones]: "Right and you go, uh, you go on a inside Ferc [sic] market based rate."
[Mr. Arora]: "Right."
(Transcription of March 11, 2002, telephone call.)
 {¶ 43} Four days later, Mr. Jones and Mr. Arora had this exchange:
[Mr. Arora]: "Ok. Like I, duh, I said now we go month by month inside Ferc."
[Mr. Jones]: "Right"
(Transcription of March 15, 2002, telephone call.)
 {¶ 44} Based upon our review of the evidence, even if the evidence is construed most strongly in Calex and Wooster's favor, Calex and Wooster's contention that reasonable minds could conclude that Calex and Wooster did not understand that they would be billed at a variable rate after the contract's anniversary date is not supported by the evidence.
 {¶ 45} Accordingly, for the foregoing reasons, Calex and Wooster's contentions that genuine issues of material fact exist concerning whether IGS satisfied its contractual obligations and whether it substantially performed its contractual obligations are not persuasive. We therefore overrule Calex and Wooster's first and third assignments of error.
 {¶ 46} Defendants' second assignment of error asserts the trial court erred by failing to apportion damages between Calex and Wooster and by improperly holding defendants jointly liable for the entire amount of damages.
 {¶ 47} In his deposition, Mr. Arora testified that he was the "president and CEO" of Wooster Products, Inc., and Calex Corporation; that he and his two daughters were shareholders of Wooster Products and Calex Corporation; and that he owned 92 percent of Wooster's shareholdings and 6.7 percent of Calex Corporation's shareholdings. (Arora Depo., at 8-9.)
 {¶ 48} In the present case, the Agreement was entered into by Mr. Arora in the following manner:
Calex Corporation/Wooster Products
By: /s/ G.K. Arora
Title: Pres.
 {¶ 49} Here, there is no ambiguity that Mr. Arora, as president of both Wooster Products, Inc. and Calex Corporation, entered into the Agreement for both corporations and bound both corporations to the terms of the Agreement. See Thompson Elec.,Inc. v. Bank One, Akron, N.A. (1988), 37 Ohio St.3d 259, 263, rehearing denied, 38 Ohio St.3d 718, citing 7 Fletcher, Cyclopedia of the Law of Private Corporations (1978), 165, Section 3033 (stating that "generally the president of the company is the proper officer to sign a binding contract"). Furthermore, according to the Agreement, all notices and communications to Calex and Wooster were to be addressed as follows:
Buyer: Attn: Jim Arora
Calex Corporation/Wooster Products
(Agreement, at 4.)
 {¶ 50} The Agreement also referred to "Calex Corporation/Wooster Products" as the "Buyer" (Agreement, at 1) and, thus, pursuant to the express terms of the Agreement, Calex and Wooster collectively constituted the "Buyer" for purposes of the Agreement.
 {¶ 51} Calex and Wooster, however, contend that the Agreement does not provide that Calex would be responsible to pay for all natural gas delivered to Wooster, nor does the Agreement provide that Wooster would be responsible to pay for all natural gas delivered to Calex.
 {¶ 52} In Spicer v. James (1985), 21 Ohio App.3d 222, the appellants were found liable by a lower court for past rent due on a lease agreement that was signed by the appellants. On appeal, as in the trial court, the appellants claimed that the lease agreement was written in the singular and only referred to a corporation as tenants. The appellants therefore reasoned that they should not be held liable as individuals for the debts of the corporation. Id. at 222-223. In affirming the judgment of the trial court, the Second District Court of Appeals in Spicer
noted that the signatures that appeared at the end of the lease agreement were signed in a dual capacity, both as individuals and as corporate officers. The Spicer court further observed that each appellant separately signed the lease agreement. TheSpicer court stated that "[g]enerally an obligation entered into by more than one person is presumed to be joint, and several responsibility will not arise except by words of severance." Id. at 223, citing 17 American Jurisprudence 2d (1964), 716, Contracts, Section 298. Accordingly, the Spicer court found that the appellants were jointly liable because no severance language appeared in the body of the agreement. Cf. Restatement of the Law 2d, Contracts (1981) 410-411, Section 289; 12 Williston On Contracts (4 Ed. 1999), 621, Section 36.3 ("Presumption as to Nature of Obligation Entered Into By Multiple Parties").
 {¶ 53} Here, the Agreement indicates that Calex and Wooster collectively entered into the Agreement. We do not find any words of severance in the Agreement. Applying Spicer, which stated at 223, that "[g]enerally an obligation entered into by more than one person is presumed to be joint, and several responsibility will not arise except by words of severance," we do not agree that the trial court erred by finding Calex and Wooster jointly liable for the entire amount of damages.
 {¶ 54} Accordingly, we overrule defendant's second assignment of error.
 {¶ 55} Defendants' fourth assignment of error asserts that genuine issues of material fact exist concerning whether IGS proved damages with reasonable certainty.
 {¶ 56} In its complaint, IGS sought recovery under the Agreement and in quantum meruit.
 {¶ 57} "Quantum meruit is an equitable doctrine based upon the concept that a party should not be unjustly enriched at the expense of another." Brune-Harpenau-Torbeck Builders, Inc. v.Torbeck (Dec. 24, 1998), Hamilton App. No. C-971072. (Footnote omitted.) "Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered."Aultman Hosp. Assn. v. Community Mut. Ins. Co. (1989),46 Ohio St.3d 51, 55.
 {¶ 58} "[W]here a valid contract exists between the parties, there can be no recovery under a theory of quantum meruit in the absence of fraud, bad faith or illegality." McManamon v. H R Mason Contractors, Inc. (Sept. 13, 2001), Cuyahoga App. No. 79014, citing Aultman, supra, at 55, citing Ullmann v. May
(1947), 147 Ohio St. 468, paragraph three of the syllabus.
 {¶ 59} "Generally, a party injured by a breach of contract is entitled to his expectation interest or `his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'"Rasnick v. Tubbs (1998), 126 Ohio App.3d 431, 437, quoting Restatement of the Law 2d, Contracts (1981) 102-103, Section 344. "Because damages for injury to an expectation interest are limited to actual loss, the evidence must establish that loss with reasonable certainty." Rasnick, at 438, citing Restatement, supra, at Section 352; see, also, Brads v. FirstBaptist Church of Germantown, Ohio (1993), 89 Ohio App.3d 328,339, motion to certify the record denied, 67 Ohio St.3d 1506.
 {¶ 60} "When a contract is breached, the innocent party may recover either his expectancy or the benefits he has conferred upon the breaching party by his performance under the contract."Yurchak v. Jack Boiman Constr. Co. (1981), 3 Ohio App.3d 15,16, citing 3 Restatement of Contracts 2d 208, Section 373; see, also, First Natl. Bank of Barnesville v. Western Union Tel. Co.
(1876), 30 Ohio St. 555, paragraph one of the syllabus (holding that "[i]n case of a breach of contract, actual damages not being proved, nominal damages may be recovered").
 {¶ 61} Here, the Agreement describes the nature of services to be rendered and the compensation to be paid. Absent from the record is evidence that Calex and Wooster received unjust enrichment outside the parameters of the Agreement. We therefore conclude that IGS is entitled to recovery only under the contract.
 {¶ 62} The Agreement provided, in relevant part:
BILLING. Seller will invoice Buyer based on Buyer's metered consumption as determined by the LDC for each month as long as Buyer's deliveries have not been suspended due to nonpayment or credit issues in which case Buyer will be invoiced based on the contract volumes. * * * Buyer and Seller acknowledge that from time to time the LDC may estimate and/or adjust meter readings to determine Buyer's consumption and that these adjustments or estimates may not accurately reflect the amount of gas physically consumed by Buyer within any given month. Seller agrees to deliver and Buyer agrees to pay for all volumes of gas during the month of the estimate or adjustment, as determined by the LDC, at the then current monthly volume rate.
* * *
BILLING DISPUTES. If Buyer, in good faith, disputes any part of any billing statement, Buyer shall provide to Seller a written explanation of the basis for the dispute no later than the due date for payment and pay the entire invoiced amount. Any overpayment by Buyer, upon determination of the correct billing amount, shall be returned to Buyer with interest accrued at the rate of one and one-half percent (1 ½%) per month, prorated by days from the date of overpayment to the date of refund.
(Agreement, at 2-3.)
 {¶ 63} In counts one, two, and three of its complaint, IGS alleged that Calex and Wooster failed to pay invoices of $92,222.11, $130,313.31, and $135,035.85, for natural gas that was delivered to Calex and Wooster in January, February and March 2003, respectively. IGS also claimed that, as a result of an audit and volume adjustments, Calex and Wooster owed an additional $97,185.25 for the period of December 2001 through June 2002, and Calex and Wooster owed an additional $21,712.04 for the period of September 2002 through January 2003. IGS also asserted that it was entitled to $832.86 for interest accrued through September 30, 2002. IGS therefore sought $477,301.42 plus interest, costs, and attorney's fees.
 {¶ 64} In its judgment, the trial court awarded monetary damages as follows:
1. With respect to Counts One, Two, and Three of the Complaint, compensatory damages against Calex and Wooster, jointly and severally, in the sum of $617,245.30; such amount includes damages in the amount of $477,301.42 plus prejudgment interest of $139,943.88, calculated at the contract rate of one and one-half percent (1 ½%) per month from the first day interest accrued on an individual invoice to September 10, 2004. For purposes of calculating the amount of interest, interest is only compounded from May 21, 2004 to September 10, 2004 because the last invoice's past due date was May 21, 2003.
2. Post-judgment interest at the contract rate of one and one-half percent (1 ½%) per month on the amount of $617,245.30 from the date this journal entry is filed until such amount is paid in full.
(September 21, 2004 Entry.)
 {¶ 65} Here, the trial court awarded compensatory damages for the third cause of action, "quantum meruit/unjust enrichment." However, as discussed above, we have already concluded that IGS properly is entitled to recovery only under the contract and not under a theory of quantum meruit. Therefore, because the trial court awarded compensatory damages with respect to IGS's quantum meruit claim, we conclude the trial court erred. Furthermore, based upon the trial court's judgment, we cannot determine to what extent the trial court relied upon the doctrine of quantum meruit when it awarded compensatory damages in favor of IGS.
 {¶ 66} Defendants assert that genuine issues of material fact exist concerning whether IGS proved damages with reasonable certainty. Because the trial court rendered summary judgment in favor of IGS, the issue resolves to whether IGS established with reasonable certainty the damages that it was due under the contract with evidence of the kind required by Civ.R. 56(C).
 {¶ 67} Civ.R. 56(C), in relevant part, provides that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."
 {¶ 68} To support its joint motion for summary judgment, IGS appended, among other things, an affidavit of Mr. Jones to its joint motion. In his March 3, 2004 affidavit, Mr. Jones averred:
41. From May 2002 through December 2002 IGS invoiced Calex and Wooster for all of its natural gas consumption at variable rates, such rates being as low as $3.628 per MCF to as high as $5.005 per MCF. The May 2002 through December 2002 invoices were paid in full except for volume adjustments related to the LDC's metered corrections by Calex and Wooster without protest or objection.
 {¶ 69} However, Mr. Jones failed to append to his affidavit copies of unpaid invoices that show volume adjustments that Calex and Wooster purportedly did not pay. See, generally, Biskupichv. Westbay Manor Nursing Home (1986), 33 Ohio App.3d 220, 222
(stating that "[t]he proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56[C] is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56[E]").
 {¶ 70} Nonetheless, despite Mr. Jones's failure to append copies of purportedly unpaid invoices to his affidavit, in an affidavit of April 2004, Mr. Arora averred that true and accurate copies of IGS's invoices from (1) January through October 2002, and (2) January through March 2003 were attached as exhibits to his affidavit. (Arora Affidavit, at paragraphs 32, 37.) However, none of these invoice copies show volume adjustments as the volume adjustments at issue apparently are reflected in a November 2002 invoice and an April 2003 invoice. Moreover, in his affidavit, Mr. Arora disputes IGS's claims regarding the amounts it is owed under the terms of the Agreement. (Arora Affidavit, at paragraph 27.)
 {¶ 71} Despite Mr. Arora's averment in his affidavit disputing the amounts owed under the Agreement, earlier in deposition testimony of February 2004 that was filed with the trial court, Mr. Arora admitted that, due to a billing dispute, defendants did not pay $97,185.25 in adjusted charges for the period of December 2001 through June 2002, as contained in an invoice dated November 18, 2002. (Arora Depo., at 244.) See, generally, Luft v. Perry Cty. Lumber Supply Co., Franklin App. No. 02AP-559, 2003-Ohio-2305, at ¶ 59, appeal not allowed,99 Ohio St.3d 1542, 2003-Ohio-4671, citing Cleveland v. PolicyManagement Sys. Corp. (1999), 526 U.S. 795, 119 S.Ct. 1597
(stating that "[w]here a plaintiff testifies to something in a deposition, inconsistent statements in a later affidavit cannot establish a genuine issue of material fact"); Zaccheus v. Mt.Carmel Health Sys. (Feb. 5, 2002), Franklin App. No. 01AP-683, appeal now allowed, 95 Ohio St.3d 1486, 2002-Ohio-2625. Thus, even construing this evidence in favor of defendants, the evidence supports a finding that defendants failed to pay $97,185.25 in adjusted charges for the period of December 2001 through June 2002.
 {¶ 72} In his deposition testimony, Mr. Arora also testified as follows:
Q. [By Attorney James Abrams] I've handed you what's been marked Exhibit 19. Do you recognize it?
A. Yes, sir.
Q. What is it?
A. Natural gas sales for January, 2003.
Q. And the total amount of that invoice is?
A. 92,222.11
* * *
Q. There's nothing attached to this invoice, is there?
A. No.
Q. Did you pay this invoice?
A. I don't remember.
* * *
Q. And in fact, as I recall, in your response you said — in response to a response to request for production of documents, you said, in fact, with respect to this invoice and others that remain unpaid there was no documentation relative to payment; is that correct?
A. Could be, sir.
* * *
Q. Okay. And if I represent to you that you said there were no documents in your possession or control related to the payment of this particular invoice, then you would agree that no check had been written?
A. Yes, sir.
(Id. at 254-256.)
 {¶ 73} However, notwithstanding Mr. Arora's deposition testimony, within the record we find notice of service of defendants' discovery responses but we do not find defendants' purported statement that IGS's counsel referenced during Mr. Arora's examination. Absent such documentation, we cannot determine the accuracy of IGS's counsel's representation of Mr. Arora's purported statement in response to a request for production of documents. Therefore, construing Mr. Arora's deposition testimony in his favor as he is the nonmoving party, we cannot conclude that Mr. Arora's deposition testimony constitutes an admission that defendants failed to pay $92,222.11 as reflected in the February 2003 invoice that was appended to Mr. Arora's deposition testimony.
 {¶ 74} Based upon our de novo review, we therefore find evidence to support an award of $97,185.25 plus interest in adjusted charges. However, we do not find evidence of the kind required by Civ.R. 56(C) to support the trial court's award of $477,301.42 plus interest.
 {¶ 75} Accordingly, because (1) the trial court improperly awarded compensatory damages based upon IGS's claim of quantum meruit; (2) except for $97,185.25 in unpaid charges, we do not find evidence of the kind required by Civ.R. 56(C) to support the trial court's award of $477,301.42 plus interest; and (3) IGS failed to prove its damages with reasonable certainty with evidence of the kind required under Civ.R. 56(C), we find defendants' fourth assignment of error to be well-taken.
 {¶ 76} Accordingly, Calex and Wooster's fourth assignment of error is sustained.
 {¶ 77} Defendants' fifth assignment of error asserts the trial court erred by granting summary judgment in favor of IGS concerning Calex and Wooster's claim against IGS for breach of contract.
 {¶ 78} As discussed above, we have already determined that IGS substantially performed under the contract. Therefore, we conclude that the trial court did not err by granting summary judgment in favor of IGS.
 {¶ 79} Accordingly, Calex and Wooster's fifth assignment of error is overruled.
 {¶ 80} Defendants' sixth assignment of error asserts that genuine questions of material fact exist concerning defendants' claims of intentional and negligent misrepresentation against IGS and third-party defendant Mr. Jones.
 {¶ 81} In their claims against IGS and Mr. Jones, Calex and Wooster alleged that in October and November 2002, they repeatedly requested IGS to establish a permanent fixed price for future deliveries of natural gas pursuant to the terms of the Agreement. Calex and Wooster alleged that, in response to their repeated requests, IGS through Mr. Jones intentionally and negligently misrepresented available natural gas pricing options and stated that natural gas prices would not increase and that it was not necessary for Calex and Wooster to establish a permanent fixed price for future deliveries of natural gas.
 {¶ 82} In Carpenter v. Scherer-Mountain Ins. Agency (1999),135 Ohio App.3d 316, dismissed, appeal not allowed (2000),88 Ohio St.3d 1424, the Fourth District Court of Appeals defined the elements of a cause of action for intentional misrepresentation. The Carpenter court stated:
The elements of a cause of action for intentional misrepresentation are as follows:
"(a) a representation or, where there is a duty to disclose, concealment of fact,
"(b) which is material to the transaction at hand,
"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
"(d) with the intent of misleading another into relying upon it,
"(e) justifiable reliance upon the representation or concealment, and
"(f) a resulting injury proximately caused by the reliance."
Id. at 327, quoting Burr v. Stark Cty. Bd. of Commrs. (1986),23 Ohio St.3d 69, paragraph two of the syllabus; Cohen v. Lamko,Inc. (1984), 10 Ohio St.3d 167, 169. See, also, Martin v. OhioState Univ. Found. (2000), 139 Ohio App.3d 89, 98.
 {¶ 83} "In the context of fraud claims, a plaintiff has the burden to prove that defendant knowingly and intentionally misled or deceived plaintiff."Doyle v. Fairfield Machine Co., Inc.
(1997), 120 Ohio App.3d 192, 208. "Fraudulent conduct may not be established by conjecture; it must be proved by direct evidence or justifiable inferences from established facts." Id., citingPumphrey v. Quillen (1955), 102 Ohio App. 173, 177, affirmed (1956), 165 Ohio St. 343.
 {¶ 84} Whether fraud exists is generally a question of fact.Carpenter, at 328, citing Kungle v. Equitable Gen. Ins. Co.
(1985), 27 Ohio App.3d 203, 206. However, "[w]hen the plaintiff fails to produce sufficient evidence from which a jury could find in his favor, a motion for summary judgment is appropriate."Doyle, supra, at 208.
 {¶ 85} In Martin, supra, this court stated:
* * * [A] claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct. Hancockv. Longo (Oct. 14, 1999), Franklin App. No. 98AP-1518, unreported, 1999 WL 816148. "Representations concerning what will occur in the future are considered to be predictions and not fraudulent misrepresentations." Assoc. for Responsible Dev. v.Fieldstone L.P. (Nov. 13, 1998), Montgomery App. No. 16994, unreported, 1998 WL 785330. The exception to this rule is when the person "who makes his promise of future action, occurrence, or conduct, and who at the time he makes it, has no intention of keeping his promise. In such case, the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent." (Emphasis sic.) Tibbs v. Natl. Homes Constr. Corp. (1977),52 Ohio App.2d 281, 287, 6 O.O.3d 300, 303, 369 N.E.2d 1218, 1223.
Id. at 98. (Emphasis sic.)
 {¶ 86} Here, representations by Mr. Jones that IGS would provide "superior service" and that it would provide the "best possible price" for natural gas, which were purportedly made prior to entering into the Agreement (Arora affidavit, at paragraph 11), concern what will occur in the future and, thus, are predictions. Martin, at 98. Construing the evidence in favor of Calex and Wooster, we find no justifiable inferences that at the time that he made such predictions, Mr. Jones, a representative of IGS, had no intention of keeping his promises.
 {¶ 87} In his deposition testimony, Mr. Arora testified that he could not recall specific representations that Mr. Jones purportedly made during October and November 2002. (Arora Depo., at 260-268; 280-283.)
 {¶ 88} Later, in his affidavit, Mr. Arora averred, in pertinent part:
40. In October, 2002 and November, 2002, Calex and Wooster made repeated requests to Jones to set or establish a permanent fixed price for future deliveries of natural gas.
41. In response to Calex and Wooster's repeated requests, Jones misrepresented available natural gas pricing options and stated that natural gas prices would not increase and that it was not necessary for Calex and Wooster to set or establish a permanent fixed price for future deliveries of natural gas.
42. Within four months of these discussions, the price IGS charged Calex and Wooster reached a high of $12.441 MCF.
43. On February 27, 2003, Jones sent me a facsimile letter which stated:
"Our intention of sending you this article is not to show you that the EIA was wrong. It is to show that any logical person with the best information would have held off locking in gas for the winter."
* * *
45. In October through December, 2002, Jones repeatedly demanded that Calex and Wooster transfer their respective accounts to IGS' "General Pool."
46. Jones repeatedly stated that IGS could only continue to provide the natural gas requirements of Calex and Wooster if they transferred their accounts to the General Pool.
47. Jones repeatedly represented to Calex and Wooster that transferring their accounts to the General Pool would not effect pricing or distribution costs.
 {¶ 89} Here, construing the evidence in favor of Calex and Wooster, the evidence supports their claim that IGS, through Mr. Jones, at some point recommended against "locking in" a permanent fixed price for future deliveries of natural gas. However, we find no justifiable inference that such a recommendation was made falsely, with knowledge of its falsity, or with utter disregard and recklessness as to the truth or falsity of the recommendation, or with an intent of misleading Calex and Wooster. Furthermore, to the extent that averments in Mr. Arora's affidavit are inconsistent with his deposition testimony, we conclude such inconsistencies cannot create a genuine issue of material fact. See, generally, Luft, supra, at ¶ 59, citingCleveland v. Policy Management Sys. Corp., supra; Zaccheus,
supra. Accordingly, we cannot conclude that the trial court erred by granting summary judgment in favor of IGS and Mr. Jones as to Calex and Wooster's claims of intentional misrepresentation.
 {¶ 90} "[A] negligent misrepresentation occurs when one supplies false information for the guidance of others." Manno v.St. Felicitas Elementary School, 161 Ohio App.3d 715, 723,2005-Ohio-3132, at ¶ 34, citing Leal v. Holtvogt (1998),123 Ohio App.3d 51, 62, citing Textron Fin. Corp. v. Nationwide Mut.Ins. Co. (1996), 115 Ohio App.3d 137, 149, dismissed, appeal not allowed (1997), 78 Ohio St.3d 1425. The elements of negligent misrepresentation are:
"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
Manno, at ¶ 33, quoting 3 Restatement of the Law 2d, Torts (1965) 126-127, Section 552(1), applied by the Supreme Court of Ohio in Gutter v. Dow Jones, Inc. (1986), 22 Ohio St.3d 286, and Haddon View Invest. Co. v. Coopers Lybrand (1982),70 Ohio St.2d 154. See, also, Martin, supra, at 103-104.
 {¶ 91} "A negligent misrepresentation does not lie for omissions; there must be some affirmative false statement."Manno, at ¶ 34, citing Leal, supra, at 62. "Liability for negligent misrepresentation is based upon the negligence of the actor in failing to exercise reasonable care or competence in supplying correct information." Marasco v. Hopewell, Franklin App. No. 03AP-1081, 2004-Ohio-6715, at ¶ 53, appeal not allowed (2005), 105 Ohio St.3d 1544, 2005-Ohio-2188, citing 4 Restatement of the Law 2d, Torts (1977), Section 552, Comment a. "`"A representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession."'" Marasco, at ¶ 53, quoting Martin, supra, at 104. Whether an actor used reasonable care in acquiring or communicating information is a question for the jury, "unless the facts are so clear as to permit only one conclusion." Marasco,
at ¶ 53, citing 4 Restatement of the Law 2d, Torts (1977), Section 552, Comment e; see, also, Gentile v. Ristas,160 Ohio App.3d 765, 2005-Ohio-2197, at ¶ 78.
 {¶ 92} Here, in a facsimile letter dated February 27, 2003, to Mr. Arora, Mr. Jones stated:
Please see the attached.
This is an excerpt from a report written by the Energy Information Administration (EIA). The EIA is a government watchdog for the energy industry. This report forecasts expectations for the winter of 2002-2003.
Our intention of sending you this article is not to show that the EIA was wrong. It is to show that any logical person with the best information would have held off on locking in gas for the winter. October 2001 NYMEX settled at the wellhead at $1.83/MMBTU with a forward one year NYMEX strip of $2.85/MMBTU and October 2002 NYMEX settled at the wellhead at $3.69/MMBTU with a forward one year forward NYMEX strip of $3.92/MMBTU. The industry's storage level was in a better situation in October 2002.
The EIA predicated average winter prices for NYMEX of $3.34/MCF in the case of a normal winter and average winter prices for NYMEX of less than $3.34/MCF in the case of an above normal winter. The weather forecasts predicted normal to above normal temperatures.
The long relentless winter has surprised everyone.
Please give me a call if you would like to discuss purchasing strategies as we move forward. Otherwise, I will be in touch if a buying opportunity is presented in the gas market.
 {¶ 93} Even strongly construing this facsimile letter and the other evidence in favor of Calex and Wooster, we cannot conclude that Mr. Jones made an affirmative false statement wherein he failed to exercise reasonable care or competence in obtaining or communicating the information. Rather, we find that the facts permit only one conclusion; namely, that no negligent misrepresentations were made.
 {¶ 94} Therefore, for the foregoing reasons, we cannot conclude that the trial court improperly granted summary judgment in favor of IGS and Mr. Jones as to Calex and Wooster's claims of negligent misrepresentation.
 {¶ 95} Accordingly, Calex and Wooster's sixth assignment of error is overruled.
 {¶ 96} As part of our de novo review, we also consider the trial court's resolution of Calex and Wooster's claims against IGS for: (1) breach of the covenant of good faith and fair dealing, and (2) promissory estoppel/detrimental reliance.
 {¶ 97} "`"Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" EdSchory Sons, Inc. v. Soc. Natl. Bank (1996),75 Ohio St.3d 433, 443-444, quoting Kham Nate's Shoes No. 2, Inc. v. FirstBank of Whiting (C.A.7, 1990), 908 F.2d 1351, 1357; see, also,Kirke La Shelle Co. v. Paul Armstrong Co. (N.Y.App. 1933),263 N.Y. 79, 87, 188 N.E. 163 (stating that "the principle that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing").
 {¶ 98} In Lakota Loc. School Dist. Bd. of Edn. v. Brickner
(1996), 108 Ohio App.3d 637, 646, the Sixth District Court of Appeals found that the covenant of good faith is part of a contract claim and does not stand alone as a separate cause of action from a breach of contract claim. Here, inasmuch as an allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim, we cannot find that summary judgment was improperly granted by the trial court in favor of IGS on Calex and Wooster's claim of breach of good faith and fair dealing. See, e.g., Northeast Ohio College of Massotherapy v. Burek
(2001), 144 Ohio App.3d 196, 204.
 {¶ 99} In Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.
(1999), 86 Ohio St.3d 270, reconsideration denied,87 Ohio St.3d 1421, the Supreme Court of Ohio stated that "[t]here can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." Id. at 274, citing Kachelmacher v. Laird (1915),92 Ohio St. 324, paragraph one of the syllabus.
 {¶ 100} Here, the Agreement provided the following:
This Agreement contains the present understanding between both parties with respect to the subject matter hereof, supersedes any prior understanding, and all prior or contemporaneous representations, statements, negotiations, understandings, and inducements are fully merged and incorporated in this agreement. This agreement not be [sic] amended or modified except by a writing executed by both parties.
Id. at 5.
 {¶ 101} To the extent that Calex and Wooster's cause of action alleging a breach of the implied covenant of good faith and fair dealing pertains to any representations, statements, negotiations, understandings, and inducements prior to the Agreement or contemporaneous with the Agreement, we find that these matters are specifically covered by the written terms of the Agreement and, therefore, no implied covenants as to these matters lie.
 {¶ 102} For the foregoing reasons and inasmuch as we have already determined that IGS did not breach its contract with Calex and Wooster, we find that summary judgment was properly granted in favor of IGS on Calex and Wooster's claim of breach of good faith and fair dealing.
 {¶ 103} In the remaining cause of action against IGS, Calex and Wooster alleged "promissory estoppel/detrimental reliance." "`Promissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed.'" Telxon Corp. v. SmartMedia of Delaware, Inc., Summit App. No. 22098, 2005-Ohio-4931, at ¶ 58, quoting Stickler v. Keycorp, Cuyahoga App. No. 80727, 2003-Ohio-283, at ¶ 18. "That is, `[t]he doctrine of promissory estoppel aids the enforcement of promises by supplying the element of consideration when necessary to prevent injustice.'"Telxon Corp., at ¶ 58, quoting Uebelacker v. Cincom Sys.,Inc. (1988), 48 Ohio App.3d 268, 273.
 {¶ 104} However, "[a]s a matter of law, Ohio does not recognize a cause of action for detrimental reliance."Carpenter, supra, at 327, fn. 3. Rather, "[d]etrimental reliance arises as an element of various causes of action (e.g. promissory estoppel, misrepresentation) but is not a cause of action unto itself." Id. at 327, fn. 3, citingGottfried-Smith v. Gottfried (1997), 119 Ohio App.3d 646, 650. (Emphasis sic.)
 {¶ 105} In Telxon Corp., the court explained that "[t]he elements of promissory estoppel are (1) a clear and unambiguous promise (2) upon which it would be reasonable and foreseeable to rely, and (3) actual reliance on the promise (4) to the detriment of the one who relied." Id. at ¶ 59, citing Marusa v.Brunswick, Medina App. No. 04CA0038-M, 2005-Ohio-1135, at ¶ 9, appeal not allowed, 106 Ohio St.3d 1486, 2005-Ohio-3978. TheTelxon Corp. `court further explained:
* * * While the making, keeping and relying upon of alleged promises are factual issues, typically for the jury, a court may deem certain circumstances objectively unreasonable, as when it finds that "reasonable minds could come to but one conclusion." Civ.R. 50(A)(4) (B). Reasonableness and foreseeability are objective factors. See Stickler [v. Keycorp., Cuyahoga App. No. 80727, 2003-Ohio-283], at ¶ 26-27. Detriment must also be viewed objectively. Id. at ¶ 27. See, also, Cohen v. CowlesMedia Co. (Minn. 1992), 479 N.W.2d 387, 391 ("It is perhaps worth noting that the test is not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice.").
Id. at ¶ 59.
 {¶ 106} Here, Calex and Wooster base their claim of promissory estoppel upon "IGS' actions, conduct, assertions and/or representations." (Counterclaim, at 13.) Even construing the evidence in favor of Calex and Wooster, we cannot conclude that they have sustained their burden to demonstrate a clear and unambiguous promise that they relied upon to their detriment. Furthermore, to the extent that "IGS' actions, conduct, assertions and/or representations" upon which Calex and Wooster purportedly relied to their detriment were made prior to or contemporaneous with the Agreement, these matters are specifically covered by the integration clause of the Agreement.
 {¶ 107} Therefore, for the foregoing reasons, we find that the trial court properly granted summary judgment in favor of IGS on Calex and Wooster's claim of promissory estoppel.
 {¶ 108} For the foregoing reasons, defendants' first, second, third, fifth, and sixth assignments of error are overruled, and their fourth assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part; reversed in part; cause remanded.
Bryant and McGrath, JJ., concur.
[1] Option 1 of the Agreement provided:
* * * Variable Price. The price per MCF delivered to the city gate for all gas delivered within the monthly tolerance pursuant to the contract will be determined monthly by the first of the month index price of gas delivered to Dominion Transmission-Appalachian plus transportation on Dominion Transmission including commodity and demand charges for the CDV, shrinkage, BTU conversion and a service fee of $0.15 per MCF. Buyer shall have the option at any time to the fixed price option at a mutually agreeable price, which shall be effective upon written amendment of this agreement.
[2] "Ferc" appears to be a reference to the Federal Energy Regulatory Commission ("FERC"). FERC, among other things, regulates the interstate transmission of electricity, natural gas, and oil. See, generally, Evid.R. 201(B) and (C) (authorizing a court to take discretionary judicial notice of a fact that is not subject to reasonable dispute in that it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").